UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| STONEWATER ADOLESCENT RECOVERY CENTER, | Case No. 19-cv-00____   3:19-CV-231-MPM-RP |
| Plaintiff, | Hon. _____, District Judge |
| v. | |
| LAFAYETTE COUNTY BOARD OF SUPERVISORS, | |
| Defendants. | |

**COMPLAINT**

Stonewater Adolescent Recovery Center, through counsel, files this complaint against The Lafayette County Board of Supervisors:

**INTRODUCTION**

1. Stonewater is a residential rehabilitation center for youth struggling with substance use and mental health disorders.

2. As a rehabilitation center that specifically treats adolescents, Stonewater meets a specific public health need. In adolescents, substance abuse interferes with the brain's development with an effect that can be more powerful than for average adults. To overcome and recover from substance use disorders, adolescents often require an intensive intervention tailored to their stage of life. Stonewater only treats adolescents and specializes in the unique treatment they require.

3. At its ribbon cutting ceremony in May 2017, U.S. Senator Roger Wicker observed that Stonewater is in the business of turning lives around. "If you've never made a mistake, then

this event may not have anything for you," he said. "I think Jesus would be a part of a program like Stonewater."[1]

4. Stonewater currently has a permit to offer residential rehabilitation services for up to 16 resident patients, but demand for its services is growing.

5. Stonewater sits on a 63-acre parcel of property in Lafayette County and has room to grow. Stonewater asked for permission to add 16 new beds each year for the next four years, but the Lafayette County Board of Supervisors said no.

6. There is no dispute that Stonewater's proposed addition meets all of the specific criteria for which such requests are reviewed pursuant to local regulation. In refusing Stonewater's request, the Board relied instead on the generalized and unsubstantiated fear that adolescents receiving treatment for substance use disorders are safety risks to the community.

7. Substance use and mental health disorders are "handicaps" under the Fair Housing Act (FHA). 42 U.S.C. § 3602(h); 24 C.F.R. § 100.201. It is unlawful for a public body to discriminate against persons with handicaps in the permitting of residences. 42 U.S.C. § 3604(f)(1); 24 C.F.R. § 100.70.

8. Substance use and mental health disorders also can qualify as "disabilities" under the Americans with Disabilities Act (ADA). 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108. It is unlawful for a public body to discriminate against persons with disabilities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

9. The Board has no lawful basis to refuse to permit Stonewater to grow. The Board treats Stonewater differently solely because of the physical and mental impairments of the persons

---

[1] *See* O'Dougherty, Kaitlin, *Stonewater Adolescent Center offers home for addiction*, djournal.com, May 31, 2017, *available at* https://www.djournal.com/news/stonewater-adolescent-recovery-center-offers-hope-for-addiction/article_e89ffa6d-01c8-5574-9b82-56205504507e.html (last visited October 12, 2019).

Stonewater serves. Because the Board's discrimination is unlawful under the FHA and the ADA, Stonewater is entitled to declaratory and injunctive relief, actual damages, and costs and reasonable attorneys' fees.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action and its parties pursuant to 28 U.S.C. § 1331 and 1343(a)(3)-(4).

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all acts complained of occurred in this district.

## PARTIES

12. Stonewater Adolescent Recovery Center is a Mississippi limited liability company doing business in Lafayette County, Mississippi.

13. The Lafayette County Board of Supervisors is a political subdivision of the State of Mississippi and has the capacity to sue and be sued.

## RELEVANT FACTS

**Stonewater**

14. Stonewater is located on a 63-acre parcel of property on County Road No. 362 in Lafayette County, Mississippi, a site selected for its seclusion and peaceful natural terrain, which complement Stonewater's therapeutic programming.

15. Stonewater's grounds currently include a residential lodge overlooking a lake, a state-of-the-art fitness center, therapy and counseling spaces, and recreational areas including a garden.

16. Stonewater treats male adolescents from the ages of 12 to 18. Stonewater offers a 90-day residential program with fully supervised substance withdrawal management.

17. Stonewater currently is permitted to offer residential rehabilitation services for up to 16 resident patients.

18. Resident patients live in a home-like setting in Stonewater's residential lodge. Alongside a therapeutic program, patients receive academic instruction that follows a nationally accredited academic curriculum. They are encouraged to explore nature and focus on removing themselves from the mindset of addiction.

19. Stonewater's grounds are monitored 24/7 by highly trained staff and are equipped with a comprehensive security system that includes around-the-clock camera supervision.

20. Stonewater's staff-to-patient ratio far exceeds industry standards. Stonewater's staff includes administrative employees as well as medical personnel such as doctors, nurses, therapists, and clinical assistants who provide services directly to patients. All staff are trained on, among other things, Stonewater's mission, operational standards, and principles of positive behavior support. Each staff member has an individualized staff training plan specific to their position and most are required to undertake continuing education. All staff members who provide direct services to patients receive comprehensive training on nonviolent crisis intervention specifically designed to prevent and defuse disruptive or risk-prone behavior.

21. Stonewater does not accept all applicants to its programs. Stonewater is not a "lockdown facility" and does not accept applicants who have a history of violent behavior or who have mental illnesses requiring distinct specialized care, such as acute schizophrenia.

22. Stonewater carefully assesses all applicants based on their biological and medical history, psychological history, social history, academic history, and other kinds of information to ensure that it is equipped to treat them.

23. Although certification is not required, Stonewater is a Mississippi Department of Mental Health certified provider of substance use disorders services. It is also accredited by The Joint Commission, whose elite accreditation is recognized nationwide.

**Growing demand and room to grow**

24. Stonewater's site plan is subject to the Lafayette County Subdivision Regulations. Those regulations provide the specific criteria by which a proposed site plan may be reviewed. At all relevant times, there were only five criteria, addressing: 1) whether the applicant timely provided all required documentation; 2) ingress-egress; 3) drainage; 4) ownership and maintenance of common areas; and 5) utilities.

25. Stonewater developed a site plan that addressed each of the five criteria and submitted its first "Application for Site Plan Approval" to the Lafayette County Planning Commission in November 2016.

26. The Commission approved the site plan but limited Stonewater to 16 resident patients. Because none of the five criteria justified the limitation, the limitation was arbitrary.

27. Stonewater built its facilities pursuant to the approved site plan and in March 2017 opened with the capacity to serve up to 16 resident patients.

28. Since then, demand for Stonewater's services has grown. Stonewater's reputation for success has traveled and it now receives inquiries from families across the United States.

29. Stonewater's property is only partially developed, having only two structures on 63 acres. Stonewater has room to grow.

30. With growing demand for Stonewater's services and with room to grow, Stonewater began planning additions to its existing site. In 2017, Stonewater commissioned Precision Engineering Corporation to develop a site plan that would allow Stonewater to expand its services.

**Stonewater's application to the Lafayette County Planning Commission**

31. On November 6, 2017, Stonewater submitted a new "Application for Site Plan Approval" to the Lafayette County Planning Commission. The application sought preliminary approval to build two outpatient treatment centers and a maximum of 10 dormitory units, each containing four bedrooms with each bedroom containing four beds. As planned, the proposed additions would disturb less than five acres and would maintain the natural terrain and vegetation of the property.

32. The Commission's hearing on Stonewater's application was held on November 28, 2017. The Commission denied Stonewater's application but not for any of the five considerations provided by the subdivision regulations.

33. The minutes of the hearing document the discussion of Stonewater's application. Based on the minutes, the Commission did not dispute that Stonewater's application satisfied all five of the subdivision regulation's criteria.

34. The Commission appeared to have been swayed instead by members of the public audience who said they opposed Stonewater's additions because they feared for the community's safety. One audience member said "every family in the community owns a gun" and "[they] will be on pins and needles if this facility is approved." Another stated he "thinks the facility is a great idea, just not in his back yard."

**Stonewater's appeal to the Lafayette County Board of Supervisors**

35. Stonewater appealed the Commission's decision to the Lafayette County Board of Supervisors.

36. In its appeal to the Board, Stonewater proposed a compromise: Stonewater's application had asked for approval to add 10 dormitory units, each containing four bedrooms with each bedroom containing four beds—for a total of 160 new beds. As a compromise, Stonewater offered to restrict itself instead to 16 new beds each year for the next four years.

37. The Board's hearing on Stonewater's application was held on June 3, 2019.

38. Several persons spoke in support of Stonewater. One person, David Magee, told the Board he had no financial or other interest in Stonewater, but he understood addiction from a father's perspective. He had visited Stonewater himself and reported: "It's clean; it's healthy. It creates good jobs; it changes lives. And for a community that thrives on greatness, it's another touch of well-balanced greatness." He opined that Stonewater is "a beautiful site" that "ultimately will increase property values out there."

39. Loren Wells told the Board her son had failed two other recovery centers before she found Stonewater: "They had the knowledge and the expertise to be able … to help him and get through to him in a way that I just wasn't able to."

40. Other persons spoke to their generalized fear for the community's safety if Stonewater's patients walked off campus or ran away. One unidentified woman who lives on Stonewater's road told the Board that she protected her home with a ".38 loaded [gun]" and "[a]nyone enrolling their child into Stonewater should demand that that facility protect their child from me." Another unidentified man, a pastor, said he "appreciates the finished product" but, "We used to never lock doors in our church. Now we lock our doors."

41. No one who spoke claimed to have personally interacted with a Stonewater patient who walked off campus or ran away.

**The evidence**

42. Stonewater's patients are teenagers and, like a lot of teenagers, even teenagers who do not struggle with addictions, they are sometimes given to act out. Stonewater anticipates rebelliousness and strives to create a culture of safety that is designed to calm heightened emotions. Stonewater's staff-to-patient ratio and nonviolent crisis intervention training help prevent incidents before they arise.

43. Sometimes a patient will walk off campus or run away. Stonewater calls these incidents "elopements."

44. Stonewater has a comprehensive and tailored plan both to prevent elopements and to ensure the health and safety of patients and staff in the event of an elopement. The plan is based on best practices, data analysis, and literature review regarding the issue of elopement from residential treatment. All staff are trained on the plan's protocol and required to follow it absolutely.

45. The plan requires that staff on duty immediately contact the sheriff's office as soon as any patient elopes, or steps off campus. Meanwhile the most senior staff member must track, i.e., follow, the eloping patient at a safe distance in the Stonewater van to ensure the patient is safe. The staff member may talk to the patient but should not try to physically stop them.

46. Because the plan requires that staff on duty immediately contact the sheriff's office as soon as any patient elopes, every elopement generates a sheriff's report. The Board pointed to those sheriff's reports at its hearing on June 3, 2019. But those sheriff's reports evidenced only 14 elopements from Stonewater's opening through June 3, 2019; accounting for the total number

of patients and days, that corresponds to a mere **1.7%** chance of elopement. Importantly, the sheriff's reports evidenced **no reported physical attacks, no thefts, no damage to off-campus property, and no incidents of off-campus violence**.

47. Dr. Brian Wind, Director of Clinical Strategy at Stonewater, observed that the data shows that Stonewater's elopement plan works. He nevertheless acknowledged that Stonewater sometimes needs the support of community partners including law enforcement. He told the Board "we want to partner with all of you here in this community to continue to do this good work":

> [T]he systems operations and protocols that we have put into place at Stonewater are absolutely working...
>
> \* \* \*
>
> But here's the truth. We're going to need the help of our community partners like law enforcement on rare occasions. We just are.
>
> \* \* \*
>
> I mean, we don't want to act like we're siloed out there and will never need the help of this community. We want to be an active part of this community that's partnered up with folks like the hospital system and law enforcement and, of course, the Board of Supervisors in executing our mission.
>
> And I come here personally, and I think we do as an organization, hat in hand to say, Let us know what we need to do, and we want to partner with all of you here in this community to continue to do this good work.

48. Elopement is the sole issue raised by opponents of Stonewater's application—and yet there is no evidence that any Stonewater elopement resulted in any damage to off-campus property or any incidents of off-campus violence.

49. There is also no known evidence that residential rehabilitation centers increase crime in their communities generally. Alcohol outlets are known to increase crime in their communities. Residential rehabilitation centers, because they are drug- and alcohol-free and are highly monitored, in fact can be crime repellents. The unidentified woman who lives on

Stonewater's road and spoke at the Board's June 3, 2019 hearing separately told the Board "[w]e live in a terrible area out there as far as drugs and fast cars." If true, Stonewater, which is drug- and alcohol-free, does not contribute to that problem and hopefully helps address it.

**The Board's denial**

50. Notwithstanding that no one disputed that Stonewater's application satisfied all five of the subdivision regulations' criteria, the Board, on motion of Chad McLarty, seconded by David Rikard, voted 4-to-1 to deny Stonewater's application.

51. The Board did not discuss its vote, but during the hearing Mike Roberts scolded Stonewater for "pat[ting] [it]self on the back" and observed the elopements "**could** have been a serious thing."

52. The Board had no lawful basis to deny Stonewater's application. The Board evidently acceded, unlawfully, to the "not in my backyard" mindset.

## CAUSES OF ACTION
### COUNT I: VIOLATION OF THE FHA

53. Stonewater re-alleges each of the foregoing paragraphs as though stated fully herein.

54. Substance use and mental health disorders are handicaps under the FHA. 42 U.S.C. § 3602(h); 24 C.F.R. § 100.201. It is unlawful for a public body to discriminate against persons with handicaps in the permitting of residences under the FHA. 42 U.S.C. § 3604(f)(1); 24 C.F.R. § 100.70.

55. The Board has no lawful basis to refuse to permit Stonewater to grow. It treats Stonewater differently solely because of the handicaps of the persons Stonewater serves.

56. The Board's refusal to permit Stonewater's proposed addition makes a dwelling unavailable to persons on account of their handicap, in violation of 42 U.S.C. § 3604(f).

57. Stonewater is an aggrieved person as defined by 42 U.S.C. § 3602(d) and (i).

58. Because of the Board's unlawful refusal to permit Stonewater's proposed addition, Stonewater has suffered and will continue to suffer the loss of association with persons protected by the FHA and the loss of revenue reasonably expected and anticipated and which but for the Board's decision it would have obtained from persons desiring and needing its services.

59. Stonewater is entitled to all the remedies authorized by the FHA and federal law, including declaratory and injunctive relief, actual damages, and costs and reasonable attorneys' fees.

## COUNT II: VIOLATION OF THE ADA

60. Stonewater re-alleges each of the foregoing paragraphs as though stated fully herein.

61. Substance use and mental health disorders can qualify as disabilities under the ADA. A disability is a "physical or mental impairment that substantially limits one or more of major life activities." 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108. Stonewater's resident patients suffer impairments as a result of their disorders that substantially limit their major life activities. Courts routinely deem persons with substance use and mental health disorders disabled within the meaning of the ADA.

62. It is unlawful for a public body to discriminate against persons with disabilities under the ADA. 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

63. The Board has no lawful basis to refuse to permit Stonewater to grow. It treats Stonewater differently solely because of the disabilities of the persons Stonewater serves.

64. In refusing to permit Stonewater's proposed addition, the Board discriminates against persons on account of their disabilities in violation of 42 U.S.C. § 12132.

65. Because of the Board's unlawful refusal to permit Stonewater's proposed addition, Stonewater has suffered and will continue to suffer the loss of association with persons protected by the ADA and the loss of revenue reasonably expected and anticipated and which but for the Board's decision it would have obtained from persons desiring and needing its services.

66. Stonewater is entitled to all the remedies authorized by the ADA and federal law, including declaratory and injunctive relief, actual damages, and costs and reasonable attorneys' fees.

_____

WHEREFORE, Stonewater respectfully requests that, after due proceedings, the Court enter judgment:

1. declaring the Board's refusal to permit Stonewater's proposed addition a violation of the FHA and the ADA;
2. ordering the Board to permit Stonewater's proposed addition;
3. awarding Stonewater actual damages, costs, and reasonable attorneys' fees to which it is entitled.

October 24, 2019     Respectfully submitted,

*/s/ Alysson Mills*

Alysson L. Mills, Miss. Bar No. 102861
Kristen D. Amond
FISHMAN HAYGOOD, LLP
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Tel: 504-586-5253

Fax: 504-586-5250
amills@fishmanhaygood.com
kamond@fishmanhaygood.com
*for Stonewater Adolescent Recovery Center*